**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) **CIVIL CASE NO.: 3:13-2444-CMC** |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **VARIOUS VEHICLES AND FUNDS** | ) |
| **DESCRIBED IN ATTACHMENT 1,** | ) |
| | ) |
| **DEFENDANTS.** | ) |
| _____ | ) |

**CLAIMANT ALIBEK TURKAYEV D/B/A AUTOMOTIVE EXPORT'S MOTION TO**
**DISMISS THE GOVERNMENT'S SECOND AMENDED COMPLAINT FOR**
**FORFEITURE *IN REM***

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 4

I.     The Parties ......................................................................................................... 4

II.    The Government's Allegations .......................................................................... 4

III.   The Allegations Relating to the Parties ........................................................... 5

IV.    The Allegations Relating to the Electronic Export Information ........................ 7

V.     The Seizure of the Property and Prior Legal Proceedings ................................ 8

VI.    Background on Automobile Export ................................................................... 9

APPLICABLE LEGAL STANDARD ................................................................................. 12

ARGUMENT ...................................................................................................................... 14

I.     The Complaint Fails to State a Claim for Civil Forfeiture Because the
       Government Cannot Establish Unlawful Activity. ........................................... 14

       A.     The Use of Undisclosed Purchasing Agents is Not a Crime. ............... 14

       B.     The Breach of a Private Non-Export Policy is Not Criminal. .............. 15

II.    The Complaint Fails to Plead Actionable Fraud. ............................................. 18

       A.     No Allegations of Fraudulent Statements Appear in the Complaint. .... 18

       B.     The Mail/Wire Fraud Allegations Fail to Allege Deprivation of "Money or
              Property" or "Convergence." ................................................................ 20

III.   The Complaint Does Not State a Claim for Forfeiture Pursuant to 18 U.S.C. § 554
       or 19 U.S.C. §1595a(d) for Unlawful Export. ................................................. 26

       A.     The Complaint Does Not Allege that SED or AES information was
              Submitted Regarding Defendant Vehicle 1. .......................................... 26

       B.     Title 19 U.S.C. § 1595 Cannot Give Rise to Forfeiture Proceedings
              Premised Upon Mail and Wire Fraud Claims. ...................................... 27

       C.     The Government Fails to Plead Actionable 13 U.S.C. § 305 Claims. ... 29

i

IV.    The Bank Account Forfeiture Claims Must Be Dismissed................................................ 33

    A.    The Automotive Export Account is Not Facilitating Property Subject to Forfeiture Under 1595a(d). ................................................................................. 33

    B.    The Automotive Export Account is Not Criminally Deprived Property. ............. 34

    C.    The Complaint Fails to Articulate that All Funds on Deposit in the Automotive Export Account are Subject to Forfeiture. ........................................ 35

CONCLUSION.................................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abex Corp./Jetway Div. v. Controlled Sys., Inc.*,
   983 F.2d 1055 (4th Cir. 1993) ...............................................................................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................12, 13

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................12, 13

*Briggs v. Newberry Cnty. Sch. Dist.*,
   838 F. Supp. 232 (D.S.C. 1992) aff'd, 989 F.2d 491 (4th Cir. 1993) ....................20

*Carolina Power & Light Co. v. Aspect Software, Inc.*,
   5:08-CV-00449BO, 2009 WL 256332 (E.D.N.C. Feb. 3, 2009)...........................17

*Carpenter v. United States*,
   484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)..............................................21

*Certain Interested Underwriters at Lloyd's, London, England v. Layne*,
   26 F.3d 39 (6th Cir 1994) ...................................................................................14

*Christensen v. Harris County*,
   529 U.S. 576 (2000)................................................................................................31

*Cleveland v. United States*,
   531 U.S. 12, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000)...................................21, 23

*Fletcher v. Bryan*,
   175 F.2d 716 (4th Cir. 1949), cert. denied 338 U.S. 851, 70 S.Ct. 82, 94 L.Ed. 521
   (1948).......................................................................................................................20

*Herkert & Meisel Trunk Co. v. Duncan*,
   141 Kan. 564, 42 P.2d 587 (1935)........................................................................14

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
   No. MDL 1532, 2006 WL 623591 (D. Me. Mar. 10, 2006) ..................................17

*In re Pathnet, Inc.*,
   01-12264-SSM, 2002 WL 31952793 (Bankr. E.D. Va. Aug. 14, 2002) ...............20

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S.Ct. 1351 (2013).....................................................................................10, 17

*Marine Midland Bank, N.A., v. United States,*
11 F.3d 1119 (2d Cir. 1993)........................................................................34, 35

*McNally v. United States,*
483 U.S. 350, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987)......................................20, 21, 22, 23

*Palmer v. BRG of Ga., Inc.,*
498 U.S. 46 (1990) *(per curiam)* .......................................................................17

*Skilling v. United States,*
561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010)....................................................21

*Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.,*
15 F.3d 327 (4th Cir. 1994) .......................................................................17

*Thyseen, Inc. v. S.S. Fortune Star,*
777 F.2d 57 (2d Cir. 1985).......................................................................16

*Topps Co. v. Cadbury Stani S.A.I.C.,*
380 F.Supp. 2d 250 (S.D.N.Y. 2005).......................................................................17

*Tuthill v. Wilsey,*
85 F. Supp. 586 (N.D. Ill. 1949) aff'd, 182 F.2d 1006 (7th Cir. 1950)....................................20

*U.S. v. 152 Char-Nor Manor Blvd.,*
114 F.3d 1178 (4th Cir. 1997) .......................................................................16

*U.S. v. 40,000.00 in U.S. Currency,*
1:09-cv-383, 2010 WL 2330353 (W.D.N.C. May 11, 2010)..................................................13

*U.S. v. Wynn,*
684 F.3d 473 (4th Cir. 2012) .......................................................................18, 23, 24

*United States v. $22,173.00 in U.S. Currency,*
716 F. Supp. 2d 245 (S.D.N.Y. 2010) .......................................................................12

*United States v. $488,342.85,*
969 F.2d. 474 (7th Cir. 1992) .......................................................................35

*United States v. $79,650 Seized from Bank of Am. account ending in -8247, in name of
Afework,*
1:08CV1233 (JCC), 2009 WL 331294 (E.D. Va. Feb. 9, 2009) ...........................................35

*United States v. 100 Chadwick Drive, Kings Mountain, N.C.,*
913 F. Supp. 430 (W.D.N.C. 1995) .......................................................................16

*United States v. 2001 Lexus LS430 VIN JTHBN30F910017797*,
   799 F. Supp. 2d 599 (E.D. Va. 2010) ..................................................................16

*United States v. Adler*,
   186 F.3d 574 (4th Cir. 1999) ..................................................................21, 22, 23

*United States v. Alghazouli*,
   517 F.3d 1179 (9th Cir. 2008) ..................................................................29

*United States v. All Funds on Deposit (Great Eastern Bank)*,
   804 F. Supp. 444 (E.D.N.Y. 1992) ..................................................................35

*United States v. All Funds Presently on Deposit at American Express Bank*,
   832 F. Supp. 542 (E.D.N.Y. 1993) ..................................................................35

*United States v. All Right, Title and Interest (8 Bayview Terrace)*,
   2010 WL 143673 (D.N.J. Jan. 4, 2010) ..................................................................35

*United States v. Blankenship*,
   382 F.3d 1110 (11th Cir. 2004) ..................................................................16, 19

*United States v. Borromeo*,
   995 F.2d 23 opinion supplemented on reh'g, 1 F.3d 219 (4th Cir. 1993) ..................................................................16

*United States v. Campbell*,
   1:11-CR-00460-AT, 2012 WL 2373037 (N.D. Ga. June 22, 2012) ..................................................................29

*United States v. Certain Accounts, Together with All Monies on Deposit Therein*,
   795 F.Supp. 391 (S.D.Fla 1992) ..................................................................34

*United States v. Cherry*,
   330 F.3d 658 (4th Cir. 2003) ..................................................................15

*United States v. Chinasa*,
   489 F. App'x 682 (4th Cir. 2012) ..................................................................25

*United States v. Contents of Accounts*,
   2010 WL 2556849 (W.D. Ky. June 18, 2010) *aff'd in part, appeal dismissed in part*,
   629 F.3d 601 (6th Cir. 2011) ..................................................................16

*United States v. Contents in Account No. 059-644190-69*,
   253 F.Supp.2d 789 (D.Vt. 2003) ..................................................................34

*United States v. Contents of Wells Fargo Bank Account, et al*,
   1:13-cv-00716, Docket Item No. 43 (S.D.Oh. Apr. 1, 2014) ..................................................................11

*United States v Contents of Wells Fargo Bank Account, et al*,
   1:13-cv-716 (S.D.Oh. Apr. 1, 2014) ......................................................16

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994)................................................................18

*United States v. Daccarett*,
   6 F.3d 37 (2d Cir. 1993) ....................................................................12

*United States v. Davis*,
   648 F.3d 84 (2d Cir. 2011)..................................................................27

*United States v. Edwards*,
   188 F.3d 230 (4th Cir. 1999) ..............................................................25

*United States v. Eight (8) Firearms*,
   2012 WL 2327998 (E.D. Tenn. June 19, 2012)....................................12

*United States v. Evans*,
   844 F.2d 36 (2d Cir. 1988)..............................................21, 22, 23, 24

*United States v. Frazier*,
   605 F.3d 1271 (11th Cir. 2010) ..........................................................29

*United States v. Gimbel*,
   830 F.2d 621 (7th Cir. 1987) .........................................................22, 23

*United States v. Harvey*,
   532 F.3d 326 (4th Cir. 2008) ..............................................................18

*United States v. Herder*,
   594 F.3d 352 (4th Cir. 2010) ..............................................................32

*United States v. Hsu*,
   12-CR-120 (D.N.H.) ..........................................................................31

*United States v. Leahy*,
   464 F.3d 773 (7th Cir. 2006) ..............................................................22

*United States v. Mask of Ka-Nefer-Nefer*,
   2012 WL 1094658 (E.D. Mo. June 1, 2012) .......................................27

*United States v. Mondragon*,
   313 F.3d 862 (4th Cir. 2002) ..............................................................12

*United States v. Neder*,
   527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)......................18, 19

*United States v. One 1976 Mercedes 450 SLC*,
   667 F.2d 1171 (5th Cir. 1982) ................................................................27

*United States v. Place*,
   693 F.3d 219 (1st Cir. 2012) .................................................................29

*United States v. Sadler*,
   2014 WL 1622194 (6th Cir. Apr. 24, 2014) ...........................21, 22, 23, 24

*United States v. Schifferli*,
   895 F.2d 987 (4th Cir. 1990) ................................................................33

**STATUTES**

13 U.S.C. § 305 ......................................................................................26, 28

13 U.S.C. § 305(1) .............................................................................28, 29, 32

13 U.S.C. § 305(2) ......................................................................................28

15 U.S.C. §§ 1-7 ........................................................................................24

15 U.S.C. §§ 12-27 .....................................................................................24

15 U.S.C. § 13 ...........................................................................................24

18 U.S.C. § 545 ..........................................................................................29

18 U.S.C. § 554 ....................................................................................26, 28, 29

18 U.S.C. § 981 ..........................................................................................16

18 U.S.C. § 984 ..........................................................................................35

18 U.S.C. § 1341 .................................................................................... passim

18 U.S.C. § 1343 ...............................................................................20, 21, 22, 24

18 U.S.C. § 1345 ..........................................................................................16

18 U.S.C. § 1346 ..........................................................................................21

18 U.S.C. § 1349 ..................................................................................16, 25, 26

18 U.S.C. § 1956(a)(2)(A) .............................................................................33, 34

18 U.S.C. § 1956(h) .....................................................................................33

19 U.S.C. § 1595 ..................................................................................................26

19 U.S.C. § 1595a ................................................................................................27

19 U.S.C. §1595a(d) ....................................................................................... passim

Ala. Code § 8-20-4(B)(x) ......................................................................................11

Anti-Smuggling Act of 1935 ................................................................................27

Ariz. Rev. Stat. Ann. § 28-4457 (H)(1)-(4) .........................................................11

Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983, *et seq* ..............................12

Dec. 8, 1993, Pub.L. 103-182, Title VI, § 624, 107 Stat. 2187 ..........................27

Del. Code Ann. Tit. 6, § 4913(12) ........................................................................11

Fla. Stat. § 320.64(26) ..........................................................................................11

Idaho Code Ann. § 49-1613(2)(s) .........................................................................11

Ind. Code § 9-32-13-18 .........................................................................................11

LA. Rev. Stat. Ann. § 32:1261(A)(1)(a)(xi) ........................................................11

Mich. Comp. Laws § 445.1574(1)(w) ...................................................................11

N.C. Gen. Stat. § 20-305.1(b3) .............................................................................11

N.J.Stat. Ann. § 56:10-7.4(p) ................................................................................11

N.Y. Vat. Law. § 463 ............................................................................................11

Nev. Rev. Stat. § 482.363571 ...............................................................................11

Ohio Rev. Code Ann. § 4517.55(B)(8) .................................................................11

Pub.L. 99-570, Title III, § 3123, 100 Stat. 3207-87 ............................................27

Pub.L. 104-132, Title VI, § 606, 110 Stat. 1290 ..................................................27

Pub.L. 109-177, Title III, § 311(d), 120 Stat. 242 ...............................................27

Pub.L. 110-403, Title II, § 209(b), 122 Stat. 4264 ...............................................27

Title V, § 502, 68 Stat. 1140 .................................................................................27

Va. Stat. 4.2 1571 (A)(6) ..........................................................................................11

Wash. Rev. Code § 46.96.192.................................................................................11

Wis. Stat. § 218.0116(4)(C) ...................................................................................11

**OTHER AUTHORITIES**

15 C.F.R. § 30 ..........................................................................................................8

15 C.F.R. § 30.6 ...............................................................................................30, 31

15 C.F.R. § 30.6(b)(9) ............................................................................................30

19 C.F.R. § 192 ......................................................................................................11

19 C.F.R. § 192.1 .............................................................................................30, 31

81 Cong. Rec. 11938 (1935) ..................................................................................27

Charlotte Allen, *The Mouse That Roared Into Orlando's Economy*, INSIGHT, Oct. 30, 1989, pp. 8 and 13........................................................................................15

Fed. R. Civ. P. 8(a) .................................................................................................12

Fed. R. Civ. P. 9(b)......................................................................................2, 13, 34

Fed. R. Civ. P. 12(b)(6) ..........................................................................................12

Fed. R. Civ. P. Supp. R. A(1)(B) ...........................................................................12

Fed. R. Civ. P. Supp. R. A(2) .................................................................................12

Fed. R. Civ. P. Supp. R. G(2) ......................................................................2, 4, 33

Fed. R. Civ. P. Supp. R. G(2)(f) ......................................................................12, 34

House Bill 1239 ......................................................................................................10

J. Dennis Hynes & Mark J. Lowenstein, *Agency, Partnership, and the LLC: The Law of Unincorporated Business Enterprises*, at p. 352 (6th Ed. 2003) ................................14

REST 3D AGEN §§ 1.04(2)(b), 2.06, 6.03, 6.05, 6.06, 6.07, 6.08, 6.11.........................15

S.Rep. No. 1036, 74th Cong., 1st Sess., 1 (1935)................................................27

Supplemental Rule G, Committee Notes on Rules 2006 – Subdivision (1) ..................13

ix

"Undisclosed Principals and Contract," L.Q.R. 2004, 120(Jul), at 480 ........................................14

Claimant, Alibek Turkayev d/b/a Automotive Export, by and through his undersigned counsel, Fox Rothschild LLP, hereby submits this Memorandum of Law in Support of the Motion to Dismiss the Second Amended Verified Complaint For Forfeiture *In Rem* ("the Complaint") filed by the United States of America ("the Government").

## PRELIMINARY STATEMENT

This case arises out of an individual's purchase and resale of automobiles.  The terms of the contract at issue between the buyer and seller govern the agreement.  In some instances, buyers agree to be bound by restrictions governing the geographic use of certain vehicles.  Such agreements are commonly referred to as "non-export agreements."  To protect the seller, non-export agreements include a liquidated damage clause, whereby the seller is reimbursed a certain percentage amount of the purchase price of the vehicle in the event the buyer opts to export the car at a later time.  For example, the civil forfeiture complaint (the "Complaint") filed by the Government makes reference to the following liquidated damage clause: "the agreement holds [the purchaser] liable for costs, expenses, damages and attorney's fees, among other things, should [the purchaser] export the vehicle outside the United States prior to six months from the date of purchase."  Breach of the foregoing clause allows the seller to pursue *civil* remedies.  It does not and cannot give rise to *criminal* liability.  Simply put, buying and selling cars is not illegal.  It never has been—it never will be.

Yet, the Government seeks forfeiture of Claimant's assets on the basis that the purchase and export of vehicles in violation of the aforementioned agreement is unlawful.  It claims that the purchasers' subsequent export of the vehicle in question was fraudulent, triggering forfeiture under mail and wire fraud statutes, as well as a host of other federal criminal laws.

1

However, the mail and wire fraud statutes were never meant to function as a remedy for any and all perceived commercial wrongs. The Government has improperly molded what is at most a breach of contract claim between two private business entities into a federal criminal offense. The theory espoused in the Complaint runs afoul of well-settled principles of law that guard the deep chasm between civil and criminal law. Not surprisingly, the Government's theory has since been abandoned by federal prosecutors in other jurisdictions after receiving sharp criticism from reviewing courts. This theory simply cannot be maintained, let alone give rise to forfeiture of substantial private assets. Claimants therefore respectfully request that this Court dismiss the instant Complaint in light of the following deficiencies:

1) all that appears within the Complaint are allegations that Claimant purchased and exported vehicles in violation of non-export agreements. Such conduct does not constitute specified unlawful activity. It can only give rise to civil, not criminal, liability. As a result, the mail/wire fraud and money laundering claims fail as a matter of law;

2) the Government's mail and wire fraud allegations omit essential elements and fail to comply with the stringent pleading requirements imposed by Rule 9(b) and Supplemental Rule G(2). For example, the Government fails to plead that Claimant or any undisclosed purchaser maintained the specific intent to defraud, or made any material misrepresentation to acquire the Defendant Vehicles. Alarmingly, prior installments of the Government's Complaint included allegations that the sales representatives were well aware the vehicles were meant for export. Realizing that such allegations doomed the fraud claims, the Government amended the Complaint and promptly removed all reference thereto;

3) the Government fails to plead deprivation of "money or property", an element critical to the viability of any fraud claim. The omission is not surprising, as the purchase of vehicles at

2

*full price* and subsequent export thereof does not deprive *anyone* of *anything*.  Furthermore, territorial restrictions of trade do not constitute property rights recognized by the mail and wire fraud statutes;

4) the Government has failed to allege injury to the defrauded party.  The Complaint suggests that the manufacturer is the party injured by export because export adversely affects its foreign pricing models.  However, the dealership, not the manufacturer is the allegedly defrauded party.  The Government therefore cannot establish "convergence," a legal requirement for mail and wire fraud claims;

5) the Government cannot establish violation of export laws.  The Government's attempt to assign criminal conduct to Claimant by citing a long list of export statutes fails because no product was exported contrary to law, and given the recent and dizzying interpretations of regulations surrounding the export of "new" versus "used" cars, it is virtually impossible to comply with information reporting requirements necessary to export vehicles;

6) and, finally, even if the Government can overcome the prior obstacles – any of which are fatal to the Complaint – the forfeiture claims directed at the seized bank account must still be dismissed.  The Complaint does not allege with sufficient particularity how the account facilitated the allegedly unlawful activity: the export or attempted export of a motor vehicle.  The mere funding of the purchase of a vehicle destined for export is not the facilitation of unlawful activity permitting forfeiture.

In sum, the Government's mail/wire fraud claims, which constitute its primary theory of forfeiture, are non-starters.  This result is to be expected, given the fact that the allegations at issue arise out of breach of contract regarding export of cars--not drug or weapon smuggling.  As set forth below, the Government's Complaint is a house of cards, seeking to manufacture

criminal activity by stacking one federal statute upon another in an attempt to justify seizure and retention of substantial assets. Accordingly, Claimant respectfully requests that the Government's Complaint be dismissed.

## STATEMENT OF FACTS

### I.    The Parties

Claimant/Movant, Alibek Turkayev is the owner of Automotive Export, located at 1639-E Juniper Lane, Charleston, South Carolina. (*See* Second Amended Complaint "Compl.") (D.I. # 71) at ¶ 38)  Mr. Turkayev, d/b/a Automotive Export has an ownership interest in the TD Bank Account ending with the digits X-0500 ("the Automotive Export Account"), one of two bank accounts that the Government seeks to forfeit. (*Id.*)  Mr. Turkayev also has an ownership interest in Defendant Vehicle 1, a 2013 Porsche Cayenne, VIN WP1AA2A6DLA08359, which is one of 14 Defendant Vehicles that the Government seeks to forfeit.

Another alleged broker, CCHJ International, is located at 18914 Camillo Court, Houston, Texas 77094 and is owned and operated by Chuan-Chuang "Jason" Hsieng. (*Id.* at  ¶ 37) CCHJ has one bank account which is the subject of this Complaint: a bank account at Metro Bank, ending with the digits x-1100. (*Id.*)  A third broker, Limo South, LLC, is located at 1639-I Juniper Lane, Charleston, South Carolina, and is owned and operated by Azat Gimranov. (*Id.* at ¶ 39)  The Complaint also identifies one alleged "straw buyer," Mr. Edward Sweet, and the individual who allegedly hired him, Mr. Martin Burke.  (*Id.* at ¶¶41, 46 and 47).

### II.    The Government's Allegations

The Complaint alleges that Automotive Export's automobile brokerage business was carried out in a manner contrary to law. Particularly, the Government claims that Automotive Export's automobiles were purchased from dealerships through the use of independent purchasers and subsequently exported. (Compl. at ¶ 38) According to the Complaint, many

4

dealerships have contractual agreements with automobile manufacturers which impose prohibitions on the export of new automobiles outside the United States. (*Id.* at ¶ 29)  Under these agreements, manufacturers "are permitted" to assess penalties, commonly called "charge backs" upon dealerships if they determine that dealerships are selling new automobiles to purchasers who intend to export them rather than use them in the United States. (*Id.*) Dealerships often require purchasers of new vehicles to sign agreements acknowledging an automobile manufacturer's export policy. (*Id.*)  In addition, certain manufacturers maintain an "Auto-Exporters" list. (*Id.*)  The list is comprised of the names of individuals who are suspected of exporting new vehicles. (*Id.*)  Many franchise dealers will not sell vehicles to individuals whose names appear on the Auto-Exporters list. (*Id.* at ¶ 30-31)  The Complaint further alleges that "individuals have devised a variety of schemes" to "mislead" the dealership into selling them new vehicles ultimately meant for export. (*Id.* at ¶ 31) One such scheme includes the use of agents, or, what the Government calls "straw buyers," designed to "mislead the dealership into believing the straw buyer is the true ultimate purchaser of the vehicle," and that the vehicle is not being purchased for export. (*Id.*)

III.    **The Allegations Relating to the Parties**

With respect to the parties at issue here, the Complaint asserts that CCHJ received wire transmissions from China, which "upon information and belief," were for the purchase of luxury vehicles manufactured for sale in the United States. (Compl. at ¶ 37) According to the Complaint, CCHJ, over the course of several months in early 2013, funded bank accounts belonging to Limo South and Automotive Export with funds that, again, "upon information and belief," were to be used "for the purchase of luxury vehicles for export." (*Id.*) In late 2012 and early 2013, Automotive Export, in turn, is alleged to have funded Limo South. (*Id.* at ¶ 38)

5

Lastly, Limo South is alleged to have obtained bank checks that it provided to "numerous," unidentified buying agents to purchase -- for export -- 11 high-end luxury vehicles. (*Id.* at ¶ 39).

The Complaint further alleges that on April 13, 2013, Edward Sweet, a buying agent, purchased Defendant Vehicle 1 from McDaniel's Porsche, with a check for $70,528.00 drawn from the Limo South Bank account. (Compl. at ¶ 41)  According to the Complaint, Mr. Sweet had e-mailed a copy of the check, as proof of funds, the day prior to purchase.  (*Id.* at ¶ 42) Sweet is alleged to have signed a non-export agreement at the time of purchase of Defendant Vehicle 1. (*Id.* at 44) The agreement is not attached, but the Complaint alleges that it contains a liquidated damages provision holding Sweet liable, should the vehicle be exported within six months from the date of purchase, for costs, expenses, damages and attorney's fees. (*Id.*)

The Complaint does not allege that fraudulent statements of any kind were made by Mr. Sweet to the sales representatives of McDaniel's Porsche.  The Complaint does not include factual pleadings regarding any statements at all made by Mr. Sweet at the time of purchase. Nor does the Complaint allege that representatives of McDaniel's Porsche relied upon averments offered by Mr. Sweet regarding the future use of Defendant Vehicle 1.  There are no allegations that sales representatives did not know Vehicle 1 was destined for export, or would not have sold Vehicle 1 had they known Mr. Sweet was intent on exporting the Vehicle.

After purchase, Mr. Sweet met with Martin Burke and loaded Defendant Vehicle 1 onto a truck. (*Id.* at ¶ 45)  Federal agents Mirandized and interviewed both Mr. Sweet and Mr. Burke at the scene; both stated that the vehicle would be exported from the United States, though the Complaint does not state when Defendant Vehicle 1 was intended for export. (*Id.* at ¶ 46-48) According to the Complaint, Mr. Burke stated that he paid Mr. Sweet $2,000 for purchasing the

vehicle. (*Id.* at ¶ 47) Mr. Burke further stated that the vehicle was purchased for Azat Gimranov. (*Id.*)

To be clear, the Government's Complaint does not include allegations that Automotive Export, any of its agents, employees or contractors, Alibek Turkayev, even Mr. Sweet or Mr. Burke, made fraudulent statements of any kind to any dealership.  There is no allegation in the Complaint that the only dealership mentioned, McDaniel's Porsche, sought damages, incurred any costs, chargebacks, legal expenses or other deprivation of money or property.  It is unclear from the face of the Complaint whether any other vehicles allegedly purchased by Automotive Consultant and/or any other combination of the named brokers, aside from Defendant Vehicle 1, were bought by purchasing agents and/ or subject to a non-export policy.  However, aside from Defendant Vehicle 1,  Defendant Property includes Defendant Vehicle 2, which was to be exported at the direction of "KNTA," "a company which appears to be closely affiliated with CCHJ,"while Defendant Vehicles 3-14 which were "scheduled for export by CCHJ." (*Id.* at ¶¶ 49, 50)

The Government also alleges that the Automotive Export Account received funds from the CCHJ Account, and used such funds to "promote the purchase of new vehicles for export." (*Id.* at ¶ 38)  The Government therefore contends the Automotive Export Account is subject to seizure pursuant "as property involved in, or traceable to," numerous statutory violations.  (*Id.* at ¶ 10)

IV.     **The Allegations Relating to the Electronic Export Information**

The export of goods is documented through electronic census forums, including Shipper's Export Declarations ("SED") as processed by the Automated Export System Direct

("AES").[1]  AES data is typically entered by licensed freight forwarders who are responsible for all export-related logistics.  The Government alleges that the electronic SED's and AES forms relative to **Defendant Vehicles 3-12** were completed in a fraudulent manner.  Specifically, the SED form contains fields that ask for a description of the vehicle.  The Government alleges that the SEDs incorrectly list the state in which the vehicle was titled and display an incorrect title number.  (Compl. at ¶¶ 51-53)  The Complaint does not allege that Turkayev actually entered the information into the AES system or directed anyone to make false statements on his behalf.

The Government does not allege that the SED or AES form regarding **Defendant Vehicle 1** was in any way inaccurate or misleading.  In fact, Defendant Vehicle 1 was seized long before it ever arrived at any port.  However, the Complaint prognosticates that had it been exported, most likely someone would have made false statements in connection with the exports. (i.e. "Upon information and belief, no [Electronic Export Information] would have been filed through AES with respect to Defendant Vehicle[] 1…, or if filed would have falsely listed the state of title.")  (*Id*. at ¶ 53).

## V.     The Seizure of the Property and Prior Legal Proceedings

According to the Complaint, on April 30, 2013 and pursuant to a seizure warrant, the Government seized all contents, or $120,786.76, of the Automotive Export Account. (*Id.* at ¶ 5) The Account's funds have since been transferred to the United States Treasury Suspense Account located in Washington, D.C.  *Id.* On May 7, 2013, the Government seized Defendant Vehicle 1, a 2013 Porsche Cayenne, VIN WP1AA2A26DLA08359. (*Id.*)  The Government also seized Defendant Vehicles 2 through 14 and the CCHJ Bank Account. (*Id.* at ¶ 5)

---

[1] With the enactment of the Foreign Trade Regulations, 15 C.F.R. 30, et eq. (2008), the Census Bureau legislated that all shipments where a paper SED was required must thereafter be filed as electronic export information ("EEI") through an Automated Export System ("AES").

The Government commenced the present forfeiture proceedings by filing a Complaint on September 10, 2013; thereafter filing an Amended Complaint on September 11, 2013. (ECF, Nos. 1 & 2) The Government then applied for warrants of arrest *in rem* for twelve vehicles, and two bank accounts; these warrants were returned as executed on September 17, 2013. (ECF, No. 33)  The Government gave formal notice of its judicial forfeiture action on October 3, 2013 and Turkayev, individually and doing business as Automotive Exports, filed a timely claim on November 5, 2013, asserting an ownership interest in Defendant Vehicle 1, and Defendant Funds 2, or the balance seized from the Automotive Export Account. (ECF No. 37)  Then on December 16, 2013, the Government Motioned for Leave to Amend its Complaint. (ECF, No. 43)  This Court granted the Government's Motion. Thereafter, Turkayev filed an amended claim of ownership to Defendant Vehicle 1 and the balance of the Automotive Export account.(ECF, No. 46)[2]

## VI.     Background on Automobile Export

There exists a long-standing civil dispute between luxury automobile manufacturers and independent automobile broker-dealers.  Luxury automobile manufacturers like Mercedes, BMW, Porsche and Land Rover charge significantly higher prices for cars sold in foreign jurisdictions like China than they do for the same automobiles sold in the United States.  Under these foreign pricing models, cars sold in foreign markets can often garner prices significantly higher than the Manufacturers Suggested Retail Price ("MSRP") sticker prices charged in the United States.  Luxury car manufacturers try to protect these foreign pricing models (and thus

---

[2] As the Court is no doubt aware, the Government has since amended and refiled its Complaint on countless occasions.  As a result, the docket is a procedural nightmare.  In addition, changes to the Complaint involved wholesale deletion and insertion of factual allegations and a wide-range of federal statutes.  To put it mildly, the Government's theory of forfeiture is a work-in-progress.

their foreign profits) by dividing markets and restricting the export of United States automobiles to foreign jurisdictions.

Purchasing cars from the United States is more economical and sensible than paying artificially high prices set by manufacturers in foreign countries. Purchasers often hire independent automobile brokers and dealers to locate cars in the United States and ship these cars overseas since the savings of purchasing United States-based vehicles significantly outweigh the international shipping costs. These independent brokers and dealers dispute a manufacturer's right to restrict the export of automobiles purchased from an authorized dealership. They contend that manufacturers' anti-export policies are harmful to American interests, constitute an unlawful restraint on international trade, potentially violate United States antitrust laws and run afoul of, *inter alia,* the "first sale doctrine," which prohibits a party from controlling the fate of his or her goods once they are enter the stream of commerce. *See In re New Motor Vehicles Canadian Export Antitrust Litigation*, No. MDL 1532, 2006 WL 623591, at *2-6 (D. Me. Mar. 10, 2006); *Kirtsaeng v. John Wiley & Sons, Inc.,* 133 S.Ct. 1351 (2013). They further contend that foreign automobile manufacturers cannot, under United States law, protect foreign profits earned in foreign jurisdictions on foreign-made automobiles.

And the independent broker/dealers are not alone. Franchised automobile dealerships generally object to being cut off from the lucrative export market. Their primary interest is the profitability of the United States-based dealerships, not the manufacturer's foreign profit margins. In the past, United States dealers lobbied for legislation that would ban manufacturers' "not for export" policies. For example, in 2001, the Florida legislature took up House Bill 1239 which would have amended the Florida Automobile Dealers Act, and would have flat-out prohibited manufacturers from restricting for-export sales. However, the legislature ultimately

10

passed a compromised version that severely restricted a manufacturer's right to penalize franchised dealerships for selling "for-export" cars. *See* Fla. Stat. § 320.64(26). Similar restrictions have been enacted in at least 15 other jurisdictions.[3]

For years, the proverbial "tug of war" between luxury automobile manufacturers' foreign pricing models and the legitimate right of United States businesses to sell goods overseas played itself out in the steps of civil courthouses and in the halls of state legislative bodies. However, beginning in or around April 2013, the United States Secret Service (the "USSS") advanced the position that the export of "new" automobiles overseas is illegal and violates export regulations found at 19 C.F.R. § 192 (the "Part 192 Regulations"). *See* New Hampshire Press Release (attached as Exhibit "1"). The USSS was apparently unaware that the CBP had reached a contrary conclusion in letter rulings issued in October 2012 and February 2013. (attached as Exhibit "2"). The arguments asserted by the USSS and prosecutors regarding the reporting requirements of "new" versus "used" vehicles quickly drew criticism from federal courts, causing prosecutors to abandon their original theory of unlawful conduct. *United States v. Contents of Wells Fargo Bank Account, et al*, 1:13-cv-00716, Docket Item No. 43 (S.D.Oh. Apr. 1, 2014) (attached as Exhibit "3").

In sum, the allegations couched within the instant Complaint are the result of a long-standing private commercial dispute, coupled with conflicting interpretations offered by various government agencies respecting auto export regulations.

---

[3] Ala. Code § 8-20-4(B)(x); Ariz. Rev. Stat. Ann. § 28-4457 (H)(1)-(4); Del. Code Ann. Tit. 6, § 4913(12); Idaho Code Ann. § 49-1613(2)(s); Ind. Code § 9-32-13-18; LA. Rev. Stat. Ann. § 32:1261(A)(1)(a)(xi); Mich. Comp. Laws § 445.1574(1)(w); Nev. Rev. Stat. § 482.363571; N.J.Stat. Ann. § 56:10-7.4(p); N.C. Gen. Stat. § 20-305.1(b3); N.Y. Vat. Law. § 463; Ohio Rev. Code Ann. § 4517.55(B)(8); Va. Stat.  4.2 1571 (A)(6); Wash. Rev. Code § 46.96.192; Wis. Stat. § 218.0116(4)(C).

## <u>APPLICABLE LEGAL STANDARD</u>

Ordinarily, the content of a complaint is governed by Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure; however, *in rem* forfeiture proceedings are subject to a higher pleading burden.  *See United States v. Mondragon*, 313 F.3d 862, 865-66 (4th Cir. 2002);*United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).  In order to survive a motion to dismiss, the Government must meet the heightened pleading requirements imposed by the Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983, *et seq*, and set forth "sufficiently detailed facts" to support a "reasonable belief that the property is subject to forfeiture."  *See* Rule G(2)(f); *Mondragon*, *supra*, 313 F.3d 862, 865-66.  The requirements under the Supplemental Rules are more stringent than the general pleading requirements as an implicit accommodation to the drastic nature of civil forfeiture proceedings.  *See United States v. Eight (8) Firearms*, 2012 WL 2327998 (E.D. Tenn. June 19, 2012).

The FRCP's Supplemental Rules for Asset Forfeiture Actions set the pleading standard for *in rem* civil forfeiture complaints.  *See* Fed. R. Civ. P. Supp. R. A(1)(B).  Supplemental Rule G(2)(f) instructs that the Government must "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial."  Thus, "the Government's complaint must assert specific facts supporting an inference that the property is subject to forfeiture." *See, e.g.*, *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 248 (S.D.N.Y. 2010).

The Federal Rules of Civil Procedure also apply to civil forfeiture actions so long as they are not "inconsistent with" the Supplemental Rules.  *See* Fed.R.Civ.P.Supp.R.  A(2); Fed.R.Civ.P.Supp.R. G ("To the extent that this rule does not address an issue, [...] the FRCP also apply.").  Accordingly, the Supreme Court's pronouncements in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) govern in deciding whether a

12

forfeiture complaint survives a motion to dismiss. *See U.S. v. 40,000.00 in U.S. Currency*, 1:09-cv-383, 2010 WL 2330353 at *3 (W.D.N.C. May 11, 2010) (attached as Exhibit "4"). In evaluating the sufficiency of factual allegations in a complaint, the Court must follow the two-step process established in *Iqbal*. First, the Court identifies and eliminates allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S at 679. Second, the Court evaluates the remaining, non-conclusory allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. This "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (citation and internal quotation marks omitted).

Because "the Civil Rules continue to provide the procedural framework within which Rule G and the other Supplemental Rules operate," Rule 9(b)'s heightened pleading standard, which applies to "all fraud claims," also applies to the Government's forfeiture allegations here. *See* Supplemental Rule G, Committee Notes on Rules 2006 – Subdivision (1). Nothing in Rule 9(b) is inconsistent with the Supplemental Rules, and because Rule G is "non-self-containing," its application in these proceedings is sanctioned. Rule 9(b) thus requires that when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Accordingly, the Government must allege particularized and specific facts demonstrating that the property at issue is subject to forfeiture, and its forfeiture allegations must first rise to the level of plausibility required by *Iqbal* and *Twombly*. And, most importantly, any fraud allegations must satisfy Rule 9(b). Because the Government has failed to meet its stringent pleading requirements, the Complaint must be dismissed.

## ARGUMENT

**I.    The Complaint Fails to State a Claim for Civil Forfeiture Because the Government Cannot Establish Unlawful Activity.**

The Government's classification of undisclosed agency (e.g., "straw buyers") as criminal is inaccurate and its treatment of private anti-export clauses in dealership franchise agreement as sacrosanct or inviolate flies in the face of centuries of developed commercial law.

### A.    The Use of Undisclosed Purchasing Agents is Not a Crime.

The Complaint alleges that Automotive Export engaged in a "scheme," involving the use of "straw buyers" to mislead the motor vehicle dealerships into believing that the vehicle was not being purchased for export. (Compl. at ¶ 15) Even taking the Government's allegations as true, the Complaint must be dismissed because the use of straw buyers is not criminal conduct.  The concept of undisclosed agency, or an agent entering into contracts on behalf of an undisclosed principal, is both common and well-established, dating back to at least the eighteenth century. *See, e.g.*, "Undisclosed Principals and Contract," L.Q.R. 2004, 120(Jul), at 480 ("The undisclosed principal doctrine dates back to at least the eighteenth century and perhaps even earlier.").[4]  Further, undisclosed agency serves several important economic functions.  For example, permitting a principal to conceal its existence is one way to prevent potentially extortionate behavior where a seller who would otherwise sell on certain terms holds out to extract superior terms based on knowledge unique to the principal, or intends to charge a certain

---

[4] *See also Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39 (6th Cir. 1994) (finding that the language of the policy tracked the hornbook example of an undisclosed principal); *Herkert & Meisel Trunk Co. v. Duncan,* 141 Kan. 564, 42 P.2d 587, 590 (1935) (holding undisclosed principal liable because purchasing merchandise on credit was "common" for retail merchants and consistent with "the manner in which such business ordinarily is conducted"); *See* J. Dennis Hynes & Mark J. Lowenstein, *Agency, Partnership, and the LLC: The Law of Unincorporated Business Enterprises*, at p. 352 (6th Ed. 2003).

principal a higher price based on its known needs an economic position.  *See* L.Q.R. 2004, 120(Jul), *supra*, at * 483.

The legitimacy and importance of undisclosed agency is further reinforced in the context of land acquisition.  One prominent example of undisclosed agency is Walt Disney's acquisition of the land necessary to construct Disney World.  *See* Charlotte Allen, *The Mouse That Roared Into Orlando's Economy*, INSIGHT, Oct. 30, 1989, pp. 8 and 13 ("So, using middlemen, stealth, and more than 100 dummy corporations, [Walt Disney] went on a secret land-buying spree near Orlando, paying about $400 an acre.")  Accordingly, there is nothing inherently illegal about the existence of an undisclosed principal, and the Restatement (Third) of Agency articulates the appropriate code of conduct, the respective liability, and contractual obligations of both agents and their undisclosed principals in the normal course of business.  REST 3D AGEN §§ 1.04(2)(b), 2.06, 6.03, 6.05, 6.06, 6.07, 6.08, 6.11.

Here, the Complaint asserts that Mr. Sweet purchased vehicles on a broker's behalf, which were destined for export.  The Government fails to articulate any criminal conduct because the use of  undisclosed agents, or straw buyers, is not, nor has it ever been, a criminal offense capable of forming the basis of a forfeiture action.

**B.    The Breach of a Private Non-Export Policy is Not Criminal.**

Civil forfeiture of assets must arise out of circumstances in which the property bears a connection to violations of state and/or federal criminal laws.  *See, e.g*., *United States v. Cherry*, 330 F.3d 658, 660 (4th Cir. 2003) (discussing forfeiture of property resulting from forgery of

bank documents); *U.S. v. 152 Char-Nor Manor Blvd.*, 114 F.3d 1178 (4th Cir. 1997) (affirming

forfeiture of personal residence used for growing marijuana).[5]

By way of example, anti-export policies typically include liquidated damage clauses that

Contrary to the examples of criminal conduct cited above, a manufacturer's anti-export

policy is not derived from any criminal statute, code or regulation.  Anti-export policies are

private restraints on trade in an attempt by luxury motor vehicle manufacturers to protect

international pricing models and the realization of inflated profits in foreign jurisdictions.  The

breach thereof is not a crime; rather, it results only in a civil claim for breach of contract.  *See*

*also United States v. Blankenship*, 382 F.3d 1110, 1133-34 (11th Cir. 2004) ("It is not illegal for

a party to breach a contract; a contract gives a party two equally viable options (perform or pay

compensation), between which it is generally at liberty to choose.").[6]

By way of example, anti-export policies typically include liquidated damage clauses that

require the purchaser to reimburse the dealer in the event the dealer suffers some economic harm

as a result of the export.   By doing so, the buyer and seller have agreed to the manner in which

damages are calculated in the event of breach by the buyer.  The Government specifically cites

---

[5] *See also United States v. Borromeo*, 995 F.2d 23, 25 opinion supplemented on reh'g, 1 F.3d 219
(4th Cir. 1993) (addressing forfeiture of personal property for illegally prescribing banned
substance); *United States v. 100 Chadwick Drive, Kings Mountain, N.C.*, 913 F. Supp. 430, 433
(W.D.N.C. 1995) (discussing forfeiture of personal residence resulting from use of residence to
host cocaine transaction);  *United States v. 2001 Lexus LS430 VIN JTHBN30F910017797*, 799 F.
Supp. 2d 599 (E.D. Va. 2010) (addressing civil forfeiture of automobiles resulting from interstate
travel with intent to engage in illicit sexual conduct).

[6] Courts in other jurisdictions have criticized the government's use of forfeiture proceedings
brought pursuant to broad forfeiture statutes such as 18 U.S.C. § 981 and 18 U.S.C. § 1341,
§1343 and § 1349, especially absent any allegations of actual unlawful activity.  *See United
States v Contents of Wells Fargo Bank Account, et al*, 1:13-cv-716, (S.D.Oh. Apr. 1, 2014)
(ordering return of seized vehicles and bank accounts allegedly involved in "illegal export
scheme" with interest) (attached as Exhibit "3"); *United States v. Contents of Accounts*, 2010
WL 2556849 (W.D. Ky. June 18, 2010) *aff'd in part, appeal dismissed in part*, 629 F.3d 601 (6th
Cir. 2011) (noting that the court is troubled by the government's use of civil forfeiture statutes to
proceed with the drastic remedy to seize substantial assets in the absence of actual criminal
conduct) (attached as Exhibit "5").

16

such a clause in its Complaint.[7] (*See* Compl. at ¶ 44)  It is well established that contract law permits and sometimes encourages "efficient breaches" of contract. *See, e.g.*, *Thyseen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir. 1985) (noting that "*breaches of contract that are in fact efficient and wealth-enhancing should be encouraged*, and that such 'efficient breaches' occur when the breaching party will still profit after compensating the other party for its 'expectation interest.'"). As one district court put it:

> [T]he law presumes that parties to contracts are rational: *they chose to breach contracts because it is more efficient to breach and pay compensatory damages than to perform*. If so, efficiency is promoted by allowing parties to break their promise, provided that they compensate the non-breaching party for actual losses.

*Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F.Supp. 2d 250, 263 n. 12 (S.D.N.Y. 2005)  (emphasis added); *Abex Corp./Jetway Div. v. Controlled Sys., Inc.*, 983 F.2d 1055 (4th Cir. 1993) (holding that egregious breach of contract can only result in award of damages arising out of the contract).

Not only is the breach of an anti-export policy designed to protect foreign profits perfectly legal, it is encouraged by decades of commercial law, especially where it results in commercial gain to the breaching party; here, the auto exporter.  If a purchaser stands to realize profits from a "for export" re-sale in excess of his contractual liability, if any, to the dealership, it is not then a crime to re-sell the vehicle.[8]  Nor is it fraud.  *See, e.g., Strum v. Exxon Co., U.S.A., a*

---

[7] "[T]he agreement holds Mr. Sweet liable for costs, expenses damages and attorney's fees, among other things, should Sweet export the vehicle outside the United States prior to six months from the date of purchase."

[8] Significant doubt exists as to whether the non-export agreements at issue are even enforceable. In fact, anti-trust market division claims have resulted in bitter litigation between consumers and automobile manufacturers. *See In re New Motor Vehicles Canadian Export Antitrust Litigation*, No. MDL 1532, 2006 WL 623591, at *2-6 (D. Me. Mar. 10, 2006) (attached as Exhibit "6"). And, courts are loathe to give credence to "dead hand" restrictions on trade.  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013); *Palmer v. BRG of Ga., Inc*., 498 U.S. 46, 49–50 (1990) (*per curiam*) ("agreements between competitors to allocate territories to minimize competition are illegal.").

*Div. of Exxon Corp.*, 15 F.3d 327, 329 (4th Cir. 1994) (affirming summary judgment dismissal of fraud claims where "plaintiff pled fanciful tort theories where redress, if any, lay in the law of contract." );  *Carolina Power & Light Co. v. Aspect Software, Inc.*, 5:08-CV-00449BO, 2009 WL 256332 (E.D.N.C. Feb. 3, 2009) (dismissing fraud claims because "where a plaintiff does nothing more than assert that a promissor never intended to honor its obligations under an agreement, dismissal as a matter of law is appropriate.").

The Government's reliance on the use of straw buyers and the circumvention of anti-export policies to acquire vehicles for export is neither criminal nor unlawful conduct, and is insufficient to sustain the present forfeiture proceedings.  The allegations in the Complaint can only give rise to breach of contract claims stemming from the contracts at issue: the non-export agreements.  As a result, the Government's mail/wire fraud and money laundering claims as to Defendant Vehicle 1 and the Automotive Export Account fail as a matter of law.

## II.    The Complaint Fails to Plead Actionable Fraud.

### A.    No Allegations of Fraudulent Statements Appear in the Complaint.

To survive a motion to dismiss, the mail and wire fraud claims must satisfy the following elements: (1) a scheme to defraud; (2) the use of the mails or wires in furtherance of the scheme; (3) a material statement or omission in furtherance of the scheme. *See United States v. Neder*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("Accordingly, we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). *See also United States v. Harvey,* 532 F.3d 326, 333 (4th Cir. 2008).

To satisfy the first element, or to demonstrate a scheme to defraud, the Government must plead with sufficient particularity that the defendant had the specific intent to defraud. *U.S. v. Wynn*, 684 F.3d 473, 477-78 (4th Cir. 2012).  To be convicted of mail fraud or wire fraud, the defendant must "specifically intend to lie or cheat or misrepresent with the design of depriving

18

the victim of something of value." *Id.*  "[M]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994).  Instead, to be guilty of mail or wire fraud, a defendant must have "misrepresent[ed] or conceal[ed] [a] *material* fact" with the specific intent to deceive as to facts material to the transaction.  *Neder, supra*, 527 U.S. at 16 (emphasis added).

Aside from general background information regarding the alleged actions of unspecified straw buyers and brokers, and the automobile industry's aversion to export, the Complaint chronicles the experience of <u>one</u> straw buyer, Mr. Edward Sweet, whose alleged fraudulent conduct can be summarized as follows:  Mr. Sweet signed a non-export agreement and soon thereafter, attempted to export the subject vehicle, Defendant Vehicle 1.  (Compl. at ¶¶ 41-46)  No other allegations of fraudulent activity appear within the Complaint.  As set forth above, the use of an agent to purchase and export a vehicle in violation of a private non-export agreement does not amount to criminal fraud.  *See Blankenship*, *supra*, 382 F.3d 1114.

Furthermore, the Complaint alludes to the fact that the dealership was aware that Mr. Sweet intended to export Defendant Vehicle 1, and possibly even arranged for the sale of the vehicle to Mr. Sweet, knowing the vehicle would be exported. (*Id.* at ¶¶ 41-43)  Notably, previous versions of the Government's Complaint allege that Turkayev stated the dealership general managers and salesmen were ***well aware*** that vehicles are sold for export, and the salesmen he dealt with only require brokers to provide buyers with a "clean name" in order to sell the vehicle. (*See* ECF No. 43-1 at ¶ 6(x))  The prior Complaint even went so far as to allege that salesmen would "contact [Turkayev] and let him of cars they had coming into inventory." (*Id*.).

19

Apparently the Government realized that such facts doomed its fraud theory because it established that no one was actually defrauded.  The most recent installment of the Complaint therefore omits any and all reference to statements made by Turkayev.  However, this Court may and should consider the earlier pre-sanitized versions of the Complaint that contain allegations fatal to the Government's fraud case.  If the dealerships knew that the cars were being exported how could anyone possibly allege fraud!  A scheme to defraud requires a victim, hapless and unknowing.  The Government's allegations describe arms-length transactions whereby the dealerships carefully considered the ramifications of the agreement and often *initiated* the negotiations with brokers.  And, the Government's prior pleadings to that effect do not vanish into thin air simply because the multiple subsequent amendments to the Complaint have taken place in an attempt to excise prior allegations harmful to its forfeiture claim.  Rather, upon a motion to dismiss courts review the entire record before them, including allegations within prior complaints. *See, e.g, Briggs v. Newberry Cnty. Sch. Dist*., 838 F. Supp. 232, 237 (D.S.C. 1992) aff'd, 989 F.2d 491 (4th Cir. 1993)(taking judicial notice of factual averments in prior pleadings).[9]  On balance, and even drawing inferences in favor of the Government's claims, the allegations within the record before the Court cannot support mail and wire fraud claims because no fraud is alleged.

### B.    The Mail/Wire Fraud Allegations Fail to Allege Deprivation of "Money or Property" or "Convergence."

---

[9] *Fletcher v. Bryan*, 175 F.2d 716, 717 (4th Cir. 1949), cert. denied 338 U.S. 851, 70 S.Ct. 82, 94 L.Ed. 521 (1948) (court may consider full record of the case before it, including facts arising from prior proceedings); *In re Pathnet, Inc.*, 01-12264-SSM, 2002 WL 31952793 (Bankr. E.D. Va. Aug. 14, 2002) (for purposes of adjudicating motion to dismiss, "the prior pleadings filed by the plaintiff may properly be considered…"); *Tuthill v. Wilsey*, 85 F. Supp. 586, 588 (N.D. Ill. 1949) aff'd, 182 F.2d 1006 (7th Cir. 1950)(granting motion to dismiss various claims in reliance in part on prior submitted complaint).

The mail and wire fraud statutes contain specific requirements, each of which the Government must allege to survive a motion to dismiss.  Omission of any of the necessary elements is fatal to the Government's fraud claims.  In particular, 18 U.S.C. §§ 1341 and 1343 require deprivation of "money or property."  The Supreme Court has long held that the mail/fraud statutes are "limited in scope to the protection of property rights," *McNally v. United States*, 483 U.S. 350, 358, 107 S. Ct. 2875, 2880, 97 L. Ed. 2d 292 (1987), and that these statutes do not proscribe schemes to defraud individuals or entities of intangible rights, such as **geographic restrictions on trade**.  *See United States v. Evans*, 844 F.2d 36 (2d Cir. 1988)(overturning mail and wire fraud convictions arising out of violations of non-export agreements).  In other words, mail and wire fraud allegations must set forth a deprivation of money or tangible property.[10],[11]  *See Cleveland v. United States*, 531 U.S. 12, 26, 121 S. Ct. 365, 374, 148 L. Ed. 2d 221 (2000) ("We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands").  Trade restrictions do not suffice.  *United States v. Sadler*, 2014 WL 1622194 (6th Cir. Apr. 24, 2014)(citing *McNally* and dismissing wire fraud claims for failure to allege actual deprivation of money or property and finding that information regarding

_____

[10] The exception is 18 U.S.C. § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Section 1346, enacted in 1988, superseded the holding in *McNally* that section 1341 did not reach "schemes to defraud citizens of their intangible rights to honest and impartial government," *McNally,* 483 U.S. at 355, 107 S.Ct. 2875.  *See also United States v. Adler*, 186 F.3d 574, 577 (4th Cir. 1999).  The Government has not alleged deprivation of "honest services".  The breadth of 18 U.S.C. § 1346 was significantly curtailed by the Supreme Court's ruling in *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), which limited liability thereunder to bribery and kickback schemes.

[11] Because the mail and wire fraud statutes share the same language in relevant part, courts apply the same analysis to both offenses. *See Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

future use of product does not constitute "deprivation" as recognized by the wire fraud statute) (attached as Exhibit "7").

Federal courts have faithfully adhered to the Supreme Court's pronouncement in *McNally*. The court's opinion in *Evans* is espcially instructive. There, the defendants were charged with violations of 18 U.S.C. §§ 1341 and 1343. 844 F.2d at 36. The defendants had contracted with the U.S. Government to sell over $2 billion worth of arms, including explosives and aircraft, to foreign nations. *Id*. Even though the defendants took title to the arms, the U.S. Government restricted re-sale of the items to "acceptable" purchasers. *Id*. Defendants were charged with breaching the agreement restricting re-sale of the weapons. *Id*.

Judge Feinberg dismissed the charges outright, holding, among other things, that 18 U.S.C. §§1341 and 1343 could not serve to enforce the contract rights of third parties whose property interests are derived from attempted restraints on trade. *Id*. at 42. The court further held that "[p]roperty law disfavors restraints on alienation and dead-hand control by prior owners." *Id*.[12] The *Evans* court therefore conclusively struck down mail and wire fraud claims arising out of failed attempts to restrain trade, because no recognized property right was

---

[12] Other circuit courts are in accord, requiring actual deprivation of money or property to sustain mail and/or wire fraud claims. *See, e.g., United States v. Adler*, 186 F.3d 574, 580 (4th Cir. 1999) (citing *McNally* and dismissing mail and wire fraud claims were government failed to allege defrauded party had been deprived of money in which it had a legitimate ownership interest); *United States v. Sadler*, 2014 WL 1622194 (6th Cir. Apr. 24, 2014)(citing *McNally* and dismissing wire fraud claims for failure to allege actual deprivation of money or property and finding that information regarding future use of product does not constitute "deprivation" as recognized by the wire fraud statute); *United States v. Leahy*, 464 F.3d 773, 787 (7th Cir. 2006) (noting that mail and wire fraud statutes require deprivation of money or property "rather than an intangible right."); *United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir. 1987) (reversing mail and wire fraud conviction where indictment failed to allege deprivation of money or property arising out of wire transfers designed to evade IRS scrutiny).

implicated.  Similarly, the instant Complaint is completely devoid of allegations capable of sustaining claims of mail and wire fraud because:

1) no actual deprivation of money or property is alleged.  For example, there are no allegations that the dealerships suffered any harm in the form of charge-backs or other penalties imposed by the manufacturers.  Nor does the Government allege actual financial harm to the dealerships resulting from the sales of the vehicles at issue.  Furthermore, the Complaint does not allege any actual harm to the manufacturers or purchasing agents;

2) the harm described by the Government, circumvention of an agreement attempting to restrain trade, is not a property right recognized by the mail or wire fraud statutes.  As set forth above, courts have consistently held that territorial restraints on trade <u>do not</u> constitute property rights protected by the mail and wire fraud statutes.  *See Sadler, supra*, 2014 WL 1622194 at *6 (6th Cir. Apr. 24, 2014); *Evans*, *supra*, 844 F.2d 36 (2d Cir. 1988);

3) the Government cannot monetize failed attempts to restrain trade in order to assert deprivation of money or property under the mail and wire fraud statutes.  As the Supreme Court made clear in *McNally*, and as subsequent federal courts have held, viable mail and/or wire fraud claims must assert deprivation of a either money or property.  Vague, esoteric future harms potentially resulting from sales of comparable products do not suffice.  *See, e.g.*, *Cleveland*, *supra*, 531 U.S. 12, 26, 121 S. Ct. 365, 374, 148 L. Ed. 2d 221; *Adler*, supra, 186 F.3d 574, 580; *Gimbel*, *supra*,  830 F.2d 621, 627; *Sadler, supra*, 2014 WL 1622194 at *6 (6th Cir. Apr. 24, 2014); *Evans*, *supra*, 844 F.2d 36 (2d Cir. 1988).  Put simply, attempted restrictions on trade–the only harm alleged–does not constitute deprivation of money or property and therefore cannot sustain mail and wire fraud claims.

23

The Complaint also fails to allege that the party defrauded was the same party who suffered harm.  A close look at the Government's Complaint reveals that the party allegedly harmed as a result of the alleged "scheme," is the automobile manufacturer seeking to preserve its distribution markets; however, the allegedly fraudulent act of *purchasing* the vehicle occurs at the dealership level. (Compl. at ¶¶ 27 & 31)  Here, those who are allegedly being defrauded (the franchise dealerships) are not the real parties in interest whom the Government claims Automotive Export intended to injure (the manufacturers).  This discrepancy is commonly known as a lack of "convergence."

The leading case addressing "convergence" in the Fourth Circuit, *United States v. Wynn*, 684 F.3d 473 (4th Cir. 2012), ultimately affirmed the defendant's conviction on the basis that the entity defrauded was also the entity that suffered harm.  *See id.* at 481.  In so holding, the court in *Wynn* applied the convergence theory in practicum, thereby indicating its favorable view of the doctrine.[13]  The *Wynn* court also cited the Second Circuit opinion in *Evans*—the seminal case applying convergence within the context of trade restraints.

As previously discussed, in *Evans*, the defendants sought to dismiss the mail and wire fraud claims on the grounds that the U.S. Government was not the party injured by the alleged fraud.  The district court ruled in favor of the defendants holding that the mail and wire fraud claims must be dismissed because the party deceived had not lost money or property.  *Id.* The dismissal was affirmed on appeal. *Id.* at 42.  In a panel decision written by Judge Feinberg, the Second Circuit held that "the point is not that the defendant must receive the same money or property that the deceived party lost, but only that the party deceived must lose money or

---

[13] The Fourth Circuit has not expressly adopted the "convergence" requirement.  *Wynn*, *supra*, 684 F.3d at 480 ("Our court has never addressed the convergence argument, and the other circuits are split on the issue . . . It is therefore apparent that the issue has not been resolved *plainly*) (emphasis in original).

24

property." *Id.* at 39-40. In declining the Government's invitation to broaden the reach of §§ 1341 and 1343 to include third parties not involved in the actual fraud, Judge Feinberg further noted that the Court was "loath to expand the wire and mail fraud statutes, since we have already tolerated an extraordinary expansion of these laws." *Id.* at 41 (internal citations omitted).

Here, according to the Complaint, the party supposedly harmed by the export of new luxury motor vehicles is the vehicle manufacturer, who suffers harm in the form of competition by other exporters.  (Compl. at ¶ 27)  However, the manufacturer cannot be said to have lost any money or property as the Supreme Court has expressly rejected restraints on property rights once they have entered the stream of commerce.[14] *See Sadler, supra*, 2014 WL 1622194 at *6 (6th Cir. Apr. 24, 2014); *Evans, supra*, 844 F.2d at 36.

The Complaint contains no allegations that the dealership, the alleged defrauded party, incurred any costs, charge backs or expenses related to the sales. And, if the only dealership cited in the Complaint, McDaniel's Porsche, was truly deceived into selling for-export automobiles, it is protected by the damages provision contained within the non-export policy. (Compl. at ¶ 44) Based on the Government's own theory and the face of the Complaint, the dealerships are insulated from any deprivation of money or property secondary to a "prohibited" export by the non-export policy.  Conversely, if the dealership knowingly sold a car for export, then there can be no deception and thus, no mail/wire fraud.  Thus, if the "victim" in this case is the manufacturer, the Government's mail/wire fraud claim fails for lack of convergence and an inability to demonstrate a loss of money or property. On the other hand, if the "victim" is the

---

[14] In fact, it constitutes anti-competitive behavior that likely runs afoul of federal statutes prohibiting unlawful restraint on trade.  *See* 15 U.S.C. §§ 1-7 (Sherman Act), 15 U.S.C. §§ 12-27 (Clayton Act), 15 U.S.C. §§ 13 (Robinson-Patman Act).

dealership, based on the Complaint the dealership is protected from any loss of money or property.  In either case, the Complaint fails to state a claim.

Because the Government's mail and wire fraud claims are insufficient, its conspiracy claims premised upon 18 U.S.C. § 1349 must also be dismissed.  (*See* Compl. at ¶¶ 9, 10, 16)  The elements of a mail and wire fraud conspiracy are: (1) the existence of an agreement to commit mail or wire fraud, (2) willing participation by the defendant, and (3) an overt act by one of the defendants in furtherance of the agreement.  *See, e.g., United States v. Chinasa*, 489 F. App'x 682, 685-86 (4th Cir. 2012); *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999). As set forth above, the Complaint does not plead facts upon which the Court can draw the reasonable inference that anyone conspired to defraud the dealerships at issue, whether using the mails or wires.  Among other things, the Complaint makes no mention of fraudulent statements of any kind, does not describe that any deprivation of money or property took place, and does not plead that the party defrauded was also the party who suffered harm.  All three of the elements necessary to support alleged violations of 18 U.S.C. § 1349 are therefore lacking.

III.   **The Complaint Does Not State a Claim for Forfeiture Pursuant to 18 U.S.C. § 554 or 19 U.S.C. §1595a(d) for Unlawful Export.**

Because the purchase and re-sale of automobiles is not illegal, the Government cites a number of export statutes and assorted regulations in an effort to describe legitimate trade as unlawful conduct in order to justify seizure of substantial private assets.

A.     **The Complaint Does Not Allege that SED or AES information was Submitted Regarding Defendant Vehicle 1.**

The Government seeks forfeiture of Defendant Vehicle 1 on the basis of unlawful export in violation of 19 U.S.C. § 1595a(d).  (*See* Compl. at ¶¶ 10, 22-23)  The Government's claims are easily disposed of.  Nowhere does the Complaint contend that Defendant Vehicle 1 was exported in violation of the SED or AES reporting requirements, or that other EEI was submitted

26

in a fraudulent manner.  For example, Paragraphs 51-53 of the Complaint allege that the EEI for **Defendant Vehicles 3 through 12** contained misleading assertions in an attempt to fraudulently export the Vehicles.  (Compl. at ¶¶ 51-52)  **Defendant Vehicle 1** is not among them.  The Government's prognostication that had Defendant Vehicle 1 been exported someone surely would have made false statements on AES forms is plainly inadequate. (Compl. at ¶ 53).  Putting aside that the Government failed to plead the "who", "what", "where" and "how" elements of a fraud case, fundamentally a forfeiture cannot be based on events that have not taken place.[15] Accordingly, the Complaint is devoid of factual averments as to Defendant Vehicle 1 capable of supporting unlawful export in violation of 13 U.S.C. § 305, which in turn, does not trigger liability under federal export statutes (whether 18 U.S.C. § 554 or 19 U.S.C. §1595a(d)).

> **B.**     **Title 19 U.S.C. § 1595 Cannot Give Rise to Forfeiture Proceedings Premised Upon Mail and Wire Fraud Claims.**

The Government cannot use § 1595a(d), a customs-facing forfeiture statute, to seize Defendant Vehicle 1 and the Automotive Export Account on the basis of Title 18 violations arising out of mail/wire fraud and money laundering allegations.  Section 1595a(d) allows the Government to forfeit property that is exported "contrary to law."  The statute's legislative history reflects that the term "contrary to law" - as used in §1595a(d) - refers to customs laws, not ordinary criminal offenses.  In other words, mail/wire fraud and money laundering violations do not trigger forfeiture under 19 U.S.C. § 1595a(d).

---

[15] *See United States v. $1,399,313.74 in U.S. Currency*, 591 F.Supp.2d 365, 375 (S.D.N.Y. 2008)(dismissing money laundering claims as inadequately pled where government's allegations asked the court to make "logical leaps in the absence of facts and credit conclusory assertions" and finding that "speculation" and "innuendo" do not suffice).

Since its inception, the phrase "contrary to law" has assumed a customs objective and has remained narrow in scope.[16]  Since 1935, Congress has amended the provision on six (6) separate occasions.[17]  Congress has never once sought to broaden the language of "contrary to law" or widen the scope of its application, despite the fact that courts have consistently applied § 1595a(d) in a narrow fashion as only addressing export activities.  The Government must therefore identify the established export law that was violated when the property was transported "illegally, unlawfully, or in a manner conflicting with established law." *See United States v. Davis*, 648 F.3d 84, 89-90 (2d Cir. 2011) (citing Black's Law Dictionary for meaning of 'contrary to law,' and holding that the Government had alleged a sufficient basis for invocation of Section 1595a claims by alleging a violation of law prohibiting, *inter alia*, transfer of stolen property in interstate or foreign commerce).[18]

In sum, 19 U.S.C. § 1595a(d) only encompasses violations of laws relating to export of goods--not mail/wire fraud and or money laundering statutes.  Because the Complaint fails to

---

[16] Originally, the phrase was incorporated within the Anti-Smuggling Act of 1935, which was specifically "directed at smugglers of large quantities of dutiable goods, primarily alcohol, who sought to 'evade our revenue laws.'"  *United States v. One 1976 Mercedes 450 SLC*, 667 F.2d 1171 (5th Cir. 1982) (*citing* S.Rep. No. 1036, 74th Cong., 1st Sess., 1 (1935)). *See also* 81 Cong. Rec. 11938 (1935).

[17] Proposed congressional amendments to 19 U.S.C. § 1595a occurred on the following dates and pursuant to the following legislative initiatives: June 17, 1930, c. 497, Title IV, § 596, as added Sept. 1, 1954, c. 1213, Title V, § 502, 68 Stat. 1140; amended Oct. 27, 1986, Pub.L. 99-570, Title III, § 3123, 100 Stat. 3207-87; Dec. 8, 1993, Pub.L. 103-182, Title VI, § 624, 107 Stat. 2187; Apr. 24, 1996, Pub.L. 104-132, Title VI, § 606, 110 Stat. 1290; Mar. 9, 2006, Pub.L. 109-177, Title III, § 311(d), 120 Stat. 242; Oct. 13, 2008, Pub.L. 110-403, Title II, § 209(b), 122 Stat. 4264.

[18] *See also United States v. Mask of Ka-Nefer-Nefer*, 2012 WL 1094658at *3 (E.D. Mo. June 1, 2012) (finding that the Government had failed to identify, in its verified complaint, the established law that was violated when the defendant property was purportedly brought illegally into the United States)(attached as Exhibit "8").

28

allege violation of laws governing export as to Defendant Vehicle 1, forfeiture cannot be premised upon § 1595a(d).

C.    **The Government Fails to Plead Actionable 13 U.S.C. § 305 Claims.**

The Government also seeks forfeiture of Defendant Vehicle 1 arising out of alleged violations of 18 U.S.C. § 554. Section 554 prohibits the fraudulent or knowing export of merchandise "contrary to any law or regulation."[19] In order to support a Section 554 claim, the Government must therefore plead facts that establish a plausible violation of a law or regulation related to the export of the Vehicles. According to the Government, the illegal conduct at issue here arises out of alleged fraudulent statements made when completing the AES forms in violation of 13 U.S.C. § 305. (Compl. at ¶ 20) Title 13 U.S.C. § 305(1) prohibits the "knowing" submission of "false or misleading information" through a Shipper's Export Declaration or Automated Export System. Section 305(2) prohibits the "knowing" submission of false information to further "illegal activity." At the outset, the Government's claims under 13 U.S.C. § 305 fail because no SEDs were ever completed with respect to Defendant Vehicle 1. As previously discussed, the Complaint contains nothing but forward-looking statements suggesting that had Defendant Vehicle 1 been exported, someone, somewhere would have made a false statement at the time of export. Furthermore, title 13 U.S.C. 305(2) prohibits the knowing submission of false information through the SED or AES "to further illegal activity." Clearly

---

[19] 18 U.S.C. § 554 provides as follows:

> **In general**.—Whoever fraudulently or knowingly exports or sends from the United State, or attempts to export or send from the United States, any merchandise, article or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any matter facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

29

Section 305(2) is not implicated because the Government's Complaint does not include allegations that Claimants acted "knowingly", in fact, the Complaint does not allege Claimants acted at all, and no "illegal activity" is described within the allegations. Instead, the Complaint rests upon a faulty legal conclusion, namely, that the use of straw buyers to export luxury vehicles in violation of a private non-export policy is a crime. It is not. The export of new or used vehicles is a legitimate trade. And as previously discussed, the use of Mr. Sweet to effectuate the sale of Defendant Vehicle 1 does not suddenly render an otherwise legal trade "contrary to law."[20]

The Complaint also does not allege that Claimants maintained the requisite culpable mental state: the "knowing" submission of false information. This is because Claimants do not complete the SED forms. Rather, freight forwarders enter the information necessary to comply with all SED regulations in order to effectuate export of the Vehicles. What information appears on, or is omitted from, the SEDs is entirely outside of Claimant's purview and cannot support the Government's claims that the SEDs were used to "knowingly" further criminal activity as part of Claimants' "fraudulent scheme." Tellingly, the Complaint does not allege who completed the SED. The Government simply asserts that certain information "was submitted through the AES, which included false representations of the states issuing the vehicle titles and title numbers."

---

[20] For example, this is not a circumstance where the use of straw buyers is contrary to a particular statute. *See United States v. Frazier*, 605 F.3d 1271, 1274 (11th Cir. 2010)(affirming conviction under 18 U.S.C. § 554 for violation of firearms statute that prohibited the use of third parties to effectuate sale of weapons). Nor do the pleadings allege export of merchandise without proper licensing. *See United States v. Campbell*, 1:11-CR-00460-AT, 2012 WL 2373037 (N.D. Ga. June 22, 2012) (applying 18 U.S.C. § 554 where defendant was charged with exporting firearm concealed within DVD player to Canada without proper licensure); *United States v. Alghazouli*, 517 F.3d 1179, 1182 (9th Cir. 2008) (affirming conviction and sentencing pursuant to 18 U.S.C. section 554 arising out of unlicensed and therefore illegal import of Freon). *United States v. Place*, 693 F.3d 219, 222 (1st Cir. 2012)(discussing 18 U.S.C. § 545 and affirming conviction for illegal trafficking in whale teeth due to lack of licensure).

30

(Compl. at ¶ 20)  For this reason alone, the Government's § 305(1) claims cannot support its theory that the Vehicles were exported by Claimants "contrary to law".

In addition, the Complaint fails to establish that the title numbers and state of issuance information regarding Defendant Vehicles 2 through 12 are mandatory items that must be reported on an SED.  And as set forth below, the regulations applicable to auto export form a dizzying and incomprehensible scheme that has caused conflicting views and irreconcilable confusion amongst federal agencies.  The regulations are nearly impossible to decipher.

For example, the contents of an SED (which was rendered obsolete effective October 1, 2008 and superseded by the AES*Direct* system) are governed by 15 C.F.R. § 30.6.  The regulations contain three categories of data elements: (a) mandatory items; (b) conditional items; and (c) optional items.  The title numbers and states of issuance are *conditional* reporting items that only apply to "used self-propelled vehicles". 15 C.F.R. § 30.6(b)(9).  A conditional item "shall be reported if they are required for or apply to the specific shipment." 15 C.F.R. § 30.6.  The export of vehicles is further governed by 19 C.F.R. § 192.1 (The "Part 192 Regulations").  The Part 192 Regulations only apply to the export of "used" automobiles, not "new" ones.

It is entirely unclear whether the Defendant Vehicles are "new" or "used" within the meaning of the Part 192 and 15 C.F.R. § 30.6 regulations.  On the one hand, they would appear to be new because they were intended for re-sale and thus not in the hands of an "ultimate purchaser."  This would take the automobile outside the definition of "used" and thus make it new and not subject to *any* reporting requirement.  On the other hand, the so-called Mobiz Letter Rulings (Exhibit "2") issued by the U.S. Customs and Border agency indicate that companies that export newly-purchased automobiles should classify them as "used" despite the fact that the export is for resale and notwithstanding the fact that the exporter is not the ultimate purchaser.

31

*See* CPB Opinions HQ H228766 (October 2, 2012) and HQ H235018 (February 20, 2013) (*See* Ex. "2"). Thus, if the vehicles are used, they are potentially subject to reporting requirements.

But which is it?  The Mobiz Letter Rulings also draw a distinction between those exporters who are licensed auto dealers and those who are not.  Licensed dealers are not "ultimate purchasers" and thus their exported vehicles are "new."  By contrast, un-licensed dealers are "ultimate purchasers" and thus, although they may export a vehicle identical in every way to their licensed counterparts, the vehicle becomes "used" and potentially subject to reporting requirements.  And further adding to the confusion is the fact that customs letter rulings are advisory in nature and thus do not have the force of law. *See Christensen v. Harris County*, 529 U.S. 576 (2000) (interpretations such as those in opinion letters lack force of law).

In *United States v. Hsu*, 12-CR-120 (D.N.H.), a California exporter pled guilty to crimes connected with auto exports in New Hampshire.  The Information filed by the Government accused the New Hampshire exporters of falsely classifying their cars as "used" on SEDs when, according to the Government, they should have been listed as "new."  Therefore, it would seem that contrary to the Mobizz Letter Rulings, the Government believes the exported vehicles to be "new."  But listing the vehicles as "new" would exempt them from Part 192 Regulations.  And, because title numbers are a conditional reporting items under 15 C.F.R. § 30.6, it would appear that if the cars are new, the "condition" will never be met and title numbers need not be actually entered into the AES*Direct* system.  So the answer to the original question – must a freight forwarder enter title numbers for exported automobiles into the AES*Direct* system – depends on (i) the legal status of the vehicle and (ii) which U.S. agency the freight forwarder listens to. Nowhere within the Complaint does the Government allege that Defendant Vehicle 1, or any of the Defendant Vehicles, are "used", or that the title numbers and states of issuance are otherwise

32

required pursuant to 15 C.F.R. § 30.6.  Furthermore,  the state of the regulations governing auto

export are in disarray, to put it mildly, and as a result, it is nearly impossible for an exporter to

decipher what requirements apply to what vehicles.  Finally, the entry of AES information is not

in any way material to the fraud allegedly occurring at the point of sale.  The Government is

therefore unable to point to any law or regulation knowingly or willfully violated by Claimants

to support its theory that the Vehicles in question were fraudulently purchased and exported in

violation of 13 U.S.C. § 305(1) or (2).

**IV.     The Bank Account Forfeiture Claims Must Be Dismissed.**

   **A.     The Automotive Export Account is Not Facilitating Property Subject to
             Forfeiture Under 1595a(d).**

The Automotive Export Account cannot be said to be "facilitating property" within the

meaning of 19 U.S.C. § 1595a(d).  Moreover, the scant facts in the Complaint fail to establish the

requisite legal connection between the property and offense.  Under a facilitation theory,

property is forfeitable only if it makes the prohibited conduct "less difficult or more or less free

from obstruction or hindrance." *See, e.g. United States v. Herder*, 594 F.3d 352, 346-65 (4th Cir.

2010).  Thus, to state a plausible forfeiture claim, the Complaint must allege that the Automotive

Export Account made the crime easier to commit or more difficult to detect;  the "crime" in this

case being an attempted export contrary to law.

The Complaint asserts that Automotive Export funds were used to purchase vehicles, sold

them to another domestic purchaser, CCHJ, who then exported the vehicles. (Compl. at ¶ 9) In

short, Automotive Export is alleged to have purchased vehicles for export, but is alleged to have

had no involvement in their export.  Bank funds used to purchase the automobiles in the first

place do not make it any easier for the exporter to subsequently circumvent any export laws.  Put

simply, property used to initially *acquire* the merchandise is not property used to *facilitate the*

*export* of merchandise.  And, movant is unaware of any reported case where money used to purchase exported merchandise was forfeited as "facilitating property" under Section 1595a(d). Therefore, even if the cars had been purchased with funds in the Automotive Export Account, the bank account itself cannot be forfeited under a facilitation theory.  To establish the requisite nexus between the property and the offense, "[t]here must be more than an incidental or fortuitous connection between the property and the offense … to find that the property facilitated or was intended to facilitate the commission of the offense." *United States v. Schifferli,* 895 F.2d 987, 990 (4th Cir. 1990). Aside from its involvement at the purchase stage, Automotive Export's Account is not alleged to have ever facilitated the export or attempted export of any of the Defendant vehicles.  Given the drastic nature of civil forfeiture actions, the formulaic assertions offered by the Government do not satisfy the stringent pleading requirements of Rule G(2).  The claims for forfeiture against the Automotive Export Account must accordingly be dismissed.

### B.     The Automotive Export Account is Not Criminally Deprived Property.

The final basis upon which the Government justifies the seizure of the Automotive Export Account includes the purported violation of money laundering statutes, namely §§ 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h) (Compl. at ¶ 6), as well as allegations that the funds constitute proceeds of "merchandise exported or sent from the United States contrary to law" in violation of 19 U.S.C. § 1595a(d). (Compl. at ¶ 22)  In order to maintain a conviction for money laundering in violation of 18 U.S.C. §1956 (a)(2)(A) the Government must allege that Automotive Export engaged or attempted to engage in unlawful activity or a monetary transaction in criminally derived property "with the intent to promote the carrying on of specified unlawful activity".  Therefore, the Government's money laundering allegations hinge upon the alleged wire and/or mail fraud – and without the latter, the former cannot stand.  The Government's Complaint, as discussed, *supra*, should be dismissed because it contains

34

inadequate factual allegations to support its position that Automotive Export engaged in any wire fraud and/or mail fraud and cannot withstand the heightened pleading requirements for fraud claims and forfeiture complaints set forth in Fed. R. Civ. P. 9(b) and Supplemental Rule G. Because the Government is unable to show any violation of mail and/or wire fraud statutes, the Government is also unable to sustain its allegations of money laundering.

### C.    The Complaint Fails to Articulate that All Funds on Deposit in the Automotive Export Account are Subject to Forfeiture.

The Government bears the elemental burden to plead facts from which the Court can draw the plausible inference that the specific amount of $120,786.76 on deposit in the Automotive Export Account is directly linked to illegal activity and therefore subject to forfeiture.  *See* Rule G(2)(f).[21]  In defense of its seizure of the entire Account, the Government simply submits that the funds seized were transferred from China to United States bank accounts with "the intent to purchase vehicles through straw buyers, and were ultimately used to make such purchases."  (Compl. at ¶ 9)

The Government offers no factual allegations to support the plausible inference that the total amount of funds on deposit; which by happenstance amounted to $120,786.76 at the time of seizure, is subject to forfeiture.  Even assuming that some portion of the funds within the Account are related to the allegations set forth in the Complaint, that does not mean that the entire content of the Account on the date of seizure is subject to forfeiture.  *See United States v. $488,342.85,* 969 F.2d. 474, 476-77 (7th Cir. 1992) (bank account is a container; fact that "dirty" money passed through an account in the past does not entitle the Government to forfeit all funds

---

[21] See also *Marine Midland Bank, N.A., v. United States*, 11 F.3d 1119 (2d Cir. 1993); *United States v. Certain Accounts, Together with All Monies on Deposit Therein*, 795 F.Supp. 391 (S.D.Fla 1992); *United States v. Contents in Account No. 059-644190-69*, 253 F.Supp.2d 789 (D.Vt. 2003).

found in the account at a later time); *United States v. All Funds Presently on Deposit at American Express Bank*, 832 F. Supp. 542, 562 (E.D.N.Y. 1993) (cannot seize funds merely because they now inhabit an account that once held tainted money).[22] Certainly the Government has access to the Automotive Export Account detailed history.  Therefore, it is well within reason to expect the Government to review such history and determine the amount of funds it believes relates to the alleged criminal offenses, and exclude those funds that are clearly unrelated to allegations of fraudulent activity.  And, although 18 U.S.C. § 984 relaxes the Government's burden of proof, it does not eliminate its burden altogether to link a specific amount of funds seized to unlawful activity.[23]  The Government therefore has no right to lay claim to the *entirety* of the funds on deposit in the Automotive Export Account simply because they inhabit the same Account that also houses allegedly "tainted" funds.

## CONCLUSION

For the reasons set forth above, Claimant respectfully requests that the Court dismiss the Government's forfeiture Complaint, release Defendant Vehicle 1 and the Automotive Export Account, and return same to Claimant's possession without further delay.

Respectfully submitted,

---

[22] *United States v. Santos*, 553 U.S. 507, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008); *United States v. All Funds on Deposit (Great Eastern Bank)*, 804 F. Supp. 444, 448 (E.D.N.Y. 1992)(only tainted money can be seized, not account itself); *United States v. All Right, Title and Interest (8 Bayview Terrace)*, 2010 WL 143673 (D.N.J. Jan. 4, 2010)(government may not seize deposits simply because they were commingled with "tainted" funds) (attached as Exhibit "9").

[23] *See Marine Midland Bank, N.A, supra,* 11 F.3d 1119, 1126  ("The enactment of § 984 was intended to lessen the government's burden of proof in forfeiture proceedings against fungible property."); *United States v. $79,650 Seized from Bank of Am. account ending in -8247, in name of Afework*, 1:08CV1233 (JCC), 2009 WL 331294 (E.D. Va. Feb. 9, 2009) ("[18 U.S.C. § 984] loosens the burden on the Government to 'trace' forfeitable property from its initial location at the time it became subject to forfeiture to its ultimate location").

/s/ G. Wells Dickson, Jr.
**G. WELLS DICKSON, JR.**
Wells Dickson, P.A.
124 S. Academy Street
Post Office Box 819
Kingstree, South Carolina 29556
Telephone No. (834) 354-5519
Email: chas@wellsdickson.com
Federal IDN: 538

/s/ Ely Goldin
Ely Goldin (admitted *pro hac vice*)
Patrick J. Egan (admitted *pro hac vice*)
Alexandra C. Scanlon (admitted *pro hac vice*)
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, Pennsylvania 19422
Telephone No. (610) 397-6509
Facsimile No. (610) 397-0450
egoldin@foxrothschild.com
pegan@foxrothschild.com
ascanlon@foxrothschild.com

**Attorneys for Claimant Alibek Turkayev d/b/a Automotive Export**

June 17, 2014
Kingstree, South Carolina

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused one true copy of the written document to be served in the above-captioned case, via the court's e-noticing system, but if that means failed, then by regular mail, on all parties of record.

s/ G. Wells Dickson, Jr.
G. WellsDickson, Jr.